(No. 19771.—

The People of the State of Illinois, Defendant in Error, *vs.* Angelo Petitti, Plaintiff in Error.

*Opinion filed December 20, 1929—Rehearing denied Feb. 11, 1930.*

Benedict J. Short, and Nash & Ahern, (Michael J. Ahern, of counsel,) for plaintiff in error.

Oscar E. Carlstrom, Attorney General, John A. Swanson, State's Attorney, and James B. Searcy, (Henry T. Chace, Jr., Edward E. Wilson, and Charles J. Mueller, of counsel,) for the People.

Mr. Justice Stone delivered the opinion of the court:

Plaintiff in error, with one Andrew Capellano and Tony Capellano, his son, were indicted in the criminal court of Cook county for the crime of kidnapping William Ranieri for ransom. At the trial plaintiff in error and Andrew

Capellano were found guilty and Tony Capellano was found not guilty. Plaintiff in error brings the cause here for review.

William Ranieri testified that he was ten years of age; that on the 6th of September, 1928, about 3:30, while he was playing on the school grounds of the St. Genevieve school, in the city of Chicago, a car drove into the alley back of the school with two men in it, one of whom asked him where Cicero street was, and he told them where it was; that while he was talking one of the men who had gotten out of the car seized him and pulled him into the car and told him he was going to take him away; that this man struck him in the eye, knocked him down to the floor of the car in front of the back seat and put his feet on him; that the car drove away swiftly; that they drove to a farm near Bourbonnais, Illinois, where they told him to get out, and that he got out in the yard and there saw a man whom he identified at the trial as Andrew Capellano. He testified that his eye was swelling and they got something to put on it, and the men left right away, telling him that they would give him some money if he wanted some to get him a pair of pants, as he was dressed in overalls. He testified that after the men left, one of the Capellanos fixed his eye and sent him up-stairs to bed with the boy, Tony; that his eye was swelled shut for more than seven days; that he was required to stay up-stairs for thirteen days; that they brought food to him and that he wanted them to call his father, but they did not do so although they had a telephone and he told them who he was and where he lived and gave them the telephone number. He further stated that after he had been there thirteen days he was taken away around 7:00 o'clock in the evening by the same men who brought him; that they rode about three hours and then the men put him out on the road somewhere near Joliet; that he saw a gasoline station with a light in it and went there and told them who he was; that the

man at the gasoline station called up the deputy sheriff, and he came in the machine and took him to Joliet and his father came and got him.

Alex F. Ranieri, father of the boy, testified that his son did not come home the night of September 6, 1928; that the next morning, about 10:00 o'clock, he received a call from somebody who told him they wanted $60,000 to bring his boy back; that he went looking for the plaintiff in error during that day but did not succeed in finding him until about 5:30 that evening and told him his boy had been kidnapped; that Petitti told him they would call him up again and to give them his (Petitti's) number and tell them to call him but didn't tell him who would call; that he was at Petitti's place about fifteen minutes and went home about half-past six; that a short time after he got home he received a telephone call from someone whom he didn't know, and that he told them to call up Petitti and gave them his telephone number; that they asked him if he had any friends, and he gave them Petitti's name and telephone number and also that of Frank Calabrace but did not give the latter's telephone number; that later on that evening Petitti called him and said, "I got to meet this fellow at Sixty-third and Cottage Grove at 10:00 o'clock in the morning;" that the witness asked if he should go along, and that at first Petitti agreed and then said, "Maybe he don't want to see you; you better not come; I will call you back at 11:00 o'clock." Witness testified that Petitti did not call him the next morning but that he called Petitti at 11:00 o'clock but could not get him but reached him on the telephone at 12:00 o'clock, and Petitti said, "I just got back; come over to the place; I will explain;" that he went to Petitti's place at 1:00 o'clock and Petitti said, "They want $60,000;" that witness told him he could not raise $60,000—that he did not have it; that he had $1000 and would give them that; that Petitti replied, "You know they took a chance to take twenty-five

years in Joliet," and said they would not take $1000. Petitti said, "They know you got $180,000 worth of bonds." Witness testified that he then told Petitti that if he would do nothing he would go and see Frank Calabrace, and that Petitti offered to go with him; that they went to see Calabrace and told him what happened, and Calabrace said that if Petitti isn't going to do anything he would try and see if he could find the boy.. Ranieri testified that at that time Petitti told him he had seen the fellows that morning at 10:00 o'clock and talked to them; that he did not say where; that the witness asked him but he would not tell. This was Saturday afternoon,. the 8th of September. Witness testified that he saw Petitti nearly every day thereafter for the next week; that on the following Thursday he saw Petitti at his place and told him he didn't want to have any trouble; that the "law" (meaning the police) were over at his house; that he said to Petitti, "Do you know where the kid is?" that Petitti told him he could have the boy back in an hour if left to him, saying, "Maybe I can get it back in an hour, but I want two days' time," and told the witness that he would call him the next day about 12:00 o'clock. He testified that at the time of this conversation Petitti made two telephone calls, giving a Pullman number for one and a VanBuren number for the other, but the witness did not know whom he called and that Petitti did not talk to anybody on either call. Ranieri testified that he told Petitti he would give $5000 to get the boy back, and Petitti said, "What is the difference—five, six or seven?" that the witness told him he would have to borrow $4000, and that Petitti replied he would call him the next day at noon, which was Friday, the 14th; that the witness gave Petitti his brother's telephone number because the officers were at his house and told him to call his brother. He testified that he did not see Petitti again until after he was arrested; that he saw him at the police station when he was arrested on the evening of Septem-

ber 14; that he talked with him the following Sunday at the police station, and he said to Petitti, "If you call up and tell them, call where the kid is, I will go out and tell Captain Dougherty that you and I will go out and bring the kid back;" that Petitti said, "What? Do you want me to get fifty years in jail by going there and calling?" that Petitti was willing to go with the witness to get the boy but that Captain Dougherty would not let them go alone but told them he would go with them, but that Petitti refused to do this; that after Petitti had been removed to another police station he had another conversation with him in which Petitti told him to get his wife and brother and he would tell them where they could get the kid. He testified on cross-examination that he thought the voice that called him the day after the boy disappeared was Petitti's, but he was not sure.

Nick Ranieri, brother of Alex, testified that Petitti arranged with Alex to meet the witness at 7312 Diversey on September 14; that on that day he went to this place looking for Petitti; that a lady came to the door and told him Petitti had just left there about ten minutes before; that the witness returned home and received another call from Petitti, and as result of that call met him the same day at Diversey and Harlem avenues, about a block from the place where he first went to meet him. The witness testified that he asked about the boy, and Petitti said: "The kid is all right; don't worry; a good thing you come this afternoon, otherwise the kid would be in St. Louis tonight." The witness testified that he asked Petitti why he didn't send the boy home and let his father fix it up, to which Petitti replied he would do the best he could but it could not be done without money; that the witness inquired as to what the cost would be, and Petitti replied, "Around $8000;" that the witness asked him why he could not make it cheaper, and he replied, "I will tell you the best we can do; we can straighten this up for $5000,

$2000 to be paid within a few days." Witness testified that he replied that that would be all right and he would try and get the money, and Petitti told him to get the money and meet him at the same place on the morning of the 15th, at 10:00 o'clock; that the witness returned home and talked to his brother, Alex, and then went to see Louis Scully about borrowing $4000 for Alex. Petitti was arrested during the evening of that day.

James F. Dougherty, John P. Ryan, James L. Mooney and Thomas Burns, police officers, testified that Petitti was arrested on the night of September 14; that when brought to the police station he stated, in the presence of Alex Ranieri and others, that he didn't know the Ranieries, never had met them, and knew nothing about the kidnapping until shortly before he was arrested, and that he denied being at 7312 Diversey avenue.

Jennie Arquilla testified that she resides at 7312 Diversey, and that on September 14 Petitti came to her house and asked to use the telephone.

Thomas Dominick, an uncle of the Ranieri boy, testified that he saw Petitti at the police station and talked with him and asked him to let the boy out and tell the witness where the boy was being kept; that Petitti replied that he didn't know, but said, "If you will get my wife or brother down here I will talk to them and see if the boy will be released;" that the witness asked him where the boy was, and he replied, "Well, I will have to get them fellows." Witness testified that pursuant to this conversation he called a telephone number given to him by Petitti; that some woman answered and said she would see; that about a half hour after, Petitti's wife and brother came in and talked to Petitti, but witness could not hear what was said. Dominick testified that he was told by Petitti's brother not to tell the police anything; that his brother said, "You fellows are talking too much; why don't you keep quiet?"

Plaintiff in error took the stand and testified that he conducted a soft drink parlor at 1525 Polk street; that on the 7th of September Alex Ranieri came to his place about 6:30 or 7:00 o'clock in the evening and told him that his boy was lost; that this was the first he had heard of it. He testified that he told Ranieri to go to the police, and he replied he didn't want to go to the police—he didn't want to let anybody know about it; that Ranieri told him he had received a telephone call and that the party calling wanted $60,000 to return the boy and asked him if he had a friend, and that Ranieri told him he gave the party talking Petitti's name. He testified that in this conversation Ranieri told him that in case he was called up, to find out what the parties had to say; that on that same night he got a telephone call asking if he was a friend of Ranieri's, telling him that they had the Ranieri boy and demanding $60,000 to bring the boy back. He testified that he told them Ranieri didn't have $60,000, and that if they would come to his place of business they could talk it over; that they then hung up. He admitted that he did not call Ranieri that night on receipt of the call, but denied that Ranieri had requested him to do so or that he had said he would but that Ranieri was to come back Saturday to see him. He testified that Calabrace told him Ranieri was willing to pay $5000 to get the boy back, and that when called again by the kidnappers he told them that Ranieri would pay $5000; that they demanded $7000, and that he told this to Ranieri's brother, Nick. He testified that the next day he received another call from the same parties and told them that he had seen Ranieri and that all he could give was $5000, and that Ranieri told him that he would give them $5000 now and $2000 a couple of weeks later, and they told him that was all right—that they would bring the boy back; that the next day, Friday, the 14th, he was called again, and the parties talking told him they would bring the boy back for $5000; that he called Nick

Ranieri and told him this and arranged to meet him at Diversey and Harlem avenues; that he went to that corner and that Nick was not there; that he went to the Arquilla house to call his wife to tell her he would be home and to have supper ready; that he called Nick again and told him he had been over there but didn't see him, and that they went back and met at the corner of Diversey and Harlem avenues but did not see anybody and returned home. He denied the conversations testified to by the State's witnesses as occurring at the police station or that he offered to return the boy if he were released. He admitted he told the police officers he didn't know Ranieri but stated that Ranieri told him the night before to tell them that; that he didn't want to give any information to the officers because Ranieri didn't want him to. He categorically denied having anything to do with the kidnapping of the boy or attempting to collect the ransom.

Fred Petitti, brother of plaintiff in error, testified that he was at the police station with plaintiff in error's wife but they were not allowed to see plaintiff in error. He denied that he had any conversation with him or that he told Dominick Ranieri and others that they were talking too much. In rebuttal James Dougherty, police officer, was re-called and testified that he was acquainted with Fred Petitti and saw him at the police station on Saturday, the 15th of September, and permitted him to talk with plaintiff in error.

Alttillio Scalzitti testified that he was at the police station on Friday or Saturday and saw Dominick there and saw him telephone to someone; that he thereafter saw plaintiff in error's wife and his brother, Fred Petitti, come into the station. Plaintiff in error again took the stand and testified that his brother Fred was not out to see him but that his brother Joe came out to see him.

Thomas Burns, a police officer who arrested plaintiff in error, was called in rebuttal and testified that at the time

of the arrest Petitti was at 1525 Polk street; that the witness was there about ten minutes at the time of the arrest; that he looked about the place and found no pop bottles, cigars or cigarettes though he did not have a search warrant to search the place. This was all of the testimony in the case.

The indictment in this case was for kidnapping for ransom. The act to prevent and punish kidnapping for ransom, approved and in force May 11, 1901, (Cahill's Stat. 1929, p. 956,) provides: "Every person who shall willfully, unlawfully and forcibly seize and secretly confine within this State * * * any person against his will or against the will of the parent, guardian or legal custodian of such person, for the purpose of extorting ransom or money or other valuable thing or concession from such person, his parent, guardian or legal custodian, * * * shall, upon conviction, suffer death, or be punished by imprisonment in the penitentiary for life or for any term not less than five years."

Counsel for plaintiff in error contend that if the evidence in this case shows any offense at all it is that of accessory after the fact, and argues that since this is so and an accessory after the fact is not a principal and cannot be charged with the principal crime, the crime charged was not proved against plaintiff in error. This argument overlooks the provisions of the act against kidnapping for ransom. This crime contains three elements: (1) The unlawful seizure; (2) secreting; and (3) the extortion of ransom or other valuable thing or concession from such person so seized and secreted, or his parent, guardian or legal custodian. Anyone having to do with the perpetration of these three acts, or any of them, is guilty of the crime of kidnapping for ransom. If plaintiff in error attempted to collect the ransom he is equally guilty with those who forcibly seized and secreted the complaining witness. His guilt is that of principal and not accessory after

the fact. This contention of plaintiff in error cannot be sustained.

It is also contended that the evidence does not support the verdict. We have set out the evidence with unusual fullness in this opinion because of the character of the crime charged against plaintiff in error. If the witnesses for the State are to be believed it has been clearly proved that plaintiff in error was assisting in collecting the ransom rather than as a friend of Ranieri. His denial of acquaintance with Ranieri or knowledge of the kidnapping until shortly before his arrest is not the usual conduct of an innocent man when arrested on a serious charge. The jury heard the witnesses. It was within their province to determine the guilt or innocence of the accused. They were justified on this record in returning a verdict of guilty against plaintiff in error.

Counsel for plaintiff in error also contend that the verdict was the result of prejudicial conduct and argument on the part of the State's attorney. Numerous instances of prejudicial statements in argument have been cited in the briefs. As to some of them the court sustained objections and as to others the objections were overruled. It would serve no useful purpose in this opinion to lengthen it to the extent required to discuss all of these charges of prejudicial conduct on the part of the State's attorney. Much that is complained of grew out of interchanges of personalities between counsel for the accused and the assistant State's attorney. Many pages of the abstract are devoted to detailing indulgence by counsel on both sides in remarks and rejoinders thereto that ought not appear in the trial of a lawsuit. Counsel for plaintiff in error here, though not his counsel in the trial court, can scarcely contend that their client is entitled to a reversal on the ground of prejudicial conduct on the part of the assistant State's attorney as to remarks which were but a reply to improper remarks of counsel for the accused.

At least one of the statements of the State's attorney relating to another criminal case was erroneous and in a case closer on the facts might constitute prejudicial error. On a review of the entire record in this case, however, we are of the opinion that we would not be justified in reversing this judgment for this error.

Counsel also contend that it was error to characterize plaintiff in error as a blackmailer and blackhand leader. While objection to this argument was sustained, counsel had a right to construe what they believed to be the State's evidence. If the testimony of the State's witnesses is to be believed, plaintiff in error was engaged in a species of extortion. The testimony of Ranieri that plaintiff in error said he could return the boy in an hour is in the record. The argument of the State's attorney that Petitti was a leader among those engaged in the business of kidnapping, whether correct or erroneous, was his construction of that evidence and within the province of legitimate argument. While blackhand and blackmail are not identical in meaning with kidnapping, we would not be justified in reversing this judgment on account of such characterization by counsel.

The only complaint of errors occurring on the trial relate to the conduct of counsel. No objection is raised as to instructions given or refused or as to rulings on the admission of evidence. The jury were justified in finding plaintiff in error guilty. The penalty in such case may be death, life imprisonment or imprisonment for any term of years not less than five. The jury fixed the punishment of plaintiff in error at twenty-five years in the penitentiary. This verdict does not indicate that the jury were swayed by prejudice or passion in arriving at their verdict.

There is no error in this record requiring reversal of the judgment, and the same is affirmed.

*Judgment affirmed.*