THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES A. WURBS, Defendant-Appellant.

Fourth District    No. 12657

Opinion filed May 20, 1976.—Rehearing denied June 15, 1976.

Peter Denger, of Rock Island, for appellant.

Basil G. Greanias, State's Attorney, of Decatur (James R. Coryell, Assistant State's Attorney, of counsel), for the People.

Mr. JUSTICE SIMKINS delivered the opinion of the court:

Defendant, James Wurbs, along with a codefendant, David McCray, was convicted, by a jury, of conspiracy to commit theft of property in excess of $150 in value. He received a sentence of three years' probation. He appeals. McCray is not a party to this appeal. On appeal defendant raises three issues: (1) Whether he was proven guilty of the offense charged; (2) Whether the trial court erred by refusing to instruct the jury on entrapment; and (3) Whether the trial court erred in refusing defendant's forms of verdict.

The home of Frank Hubbard in Decatur was burglarized in March, 1971. Among other items taken was an antique gun collection. In June, 1972, Hubbard advertised in The Gun Report, a gun magazine, that he would pay a $25,000 reward for the return of the collection, or for information leading to its recovery. On July 19, 1972, Hubbard received a call from defendant, who was an attorney practicing in Rock Island, Illinois. Wurbs told Hubbard he would like to meet with Hubbard's attorney to discuss arrangements for the return of the guns. Subsequently a meeting was held in Decatur with Hubbard, Rosenberg who was his attorney, Wurbs and an insurance representative. At the meeting Rosenberg suggested a plan by which the guns could be returned "legally." Defendant agreed to the plan.

Defendant testified that, a short while prior to July 19, 1972, he received a phone call from a man who identified himself as "Balmer." "Balmer" told the defendant about the advertisement and that he thought he could get the guns. He asked defendant if he would be interested in contacting Hubbard to find out details of the reward. Wurbs said he would think about it and that the caller was to check back in a few days. When the man called back, Wurbs told him that Wurbs did not see anything wrong in his making arrangements with Hubbard. Wurbs was told that he would receive a copy of the magazine and some photographs of the guns and these arrived in the mail within a few days. Wurbs also informed "Balmer" that he would charge a fee of 10% of the reward collected. Wurbs told Rosenberg, Hubbard's lawyer, that he was working on a contingency fee basis.

Defendant testified that on his way home from the Decatur meeting, a car, which he subsequently found had been rented by an insurance adjusting firm, attempted to run him off the road. After this, Wurbs called Rosenberg to tell him the deal was off.

On August 1, 1972, Hubbard and Wurbs met in Rock Island to discuss the situation. Each testified that the other initiated that meeting. Hubbard suggested another plan for the exchange of the guns and money. Hubbard testified Wurbs told him that Wurbs had to do things for "these clowns" because they were not right, they were high school dropouts. Wurbs also told Hubbard the guns were in a warehouse six hours away. On August 4, 1972, Hubbard called defendant to ask if any progress had been made. Defendant said there had not been since he had not been in contact with the people. Wurbs testified "Balmer" called several weeks later and Wurbs told him he didn't want anything further to do with it. Wurbs also relayed Hubbard's plan which "Balmer" rejected.

Defendant testified there were no further contacts between August and December, 1972. Hubbard testified to the opposite effect. In December, 1972, Rosenberg wrote to Wurbs asking him to resume negotiations. Wurbs responded in January, 1973. There was further contact and several exchanges were planned for February in Springfield, but these were called off. Finally an exchange was arranged for March 6, 1973, in Rock Island. On that date some guns were exchanged for part of the reward money. The testimony detailed the actions of the participants in the exchanges on March 6 and 7. However, it is not necessary to recount those activities in this opinion.

On March 8, 1973, the police arrested David McCray as he attempted to pick up a truck containing the remainder of the gun collection.

Betsey Green, Wurbs' secretary, testified that Wurbs would occasionally receive calls from someone named Skinny, who left long distance numbers for Wurbs to call. Ms. Green testified that Skinny called Wurbs' office on March 7, when Frank Hubbard and Horace Hoff, a Decatur police officer, were present and that the three left immediately after the call. Wurbs testified that McCray had been a client of his earlier, and that the person who called on March 7 was not "Balmer" but another person.

A roommate of McCray's testified that McCray was known as Skinny. The roommate also testified that he helped McCray, on March 6, 1973, drop off a box of guns at a location in Rock Island consistent with a description of Wurbs' house, where some of the guns were recovered as part of the exchange plan.

Defendant argues that he was merely a middleman and that, as a matter of law, his conduct does not constitute the offense of conspiracy to commit theft. His theory, apparently, is that lawyers can legally represent

thieves in arranging for the ransoming of stolen goods, and, indeed, to share in the ransom on a contingent basis in the process.

Conspiracy is defined by the Criminal Code (Ill. Rev. Stat. 1971, ch. 38, §8—2(a)):

> "A person commits conspiracy when, with intent that an offense be committed, he agrees with another to the commission of the offense. No person may be convicted of conspiracy to commit an offense unless an act in furtherance of such agreement is alleged and proved to have been committed by him or a co-conspirator."

Count I of the indictment alleged a conspiracy to commit theft over $150 in terms of subsection (d)(1) of the theft statute. Count II was in terms of subsection (d)(3).

> A person commits theft when he knowingly:
>
> * * *
>
> (d) Obtains control over stolen property knowing the property to have been stolen by another or under such circumstances as would reasonably induce him to believe that the property was stolen, and
>
>> (1) Intends to deprive the owner permanently of the use or benefit of the property; or
>>
>> * * *
>>
>> (3) Uses, conceals, or abandons the property knowing such use, concealment or abandonment probably will deprive the owner permanently of such use or benefit." Ill. Rev. Stat. 1971, ch. 38, §16—1(d)(1), (3).

"Permanently deprived" is defined in section 15—3(c) of the Criminal Code (Ill. Rev. Stat. 1971, ch. 38, §15—3(c)) as meaning to:

> "Retain the property with intent to restore it to the owner only if the owner purchases or leases it back, or pays a reward or other compensation for its return."

Although defendant argues that the evidence does not show that he ever had possession of the guns, this is not necessary since defendant was not charged with theft but with conspiracy. In order to be convicted of conspiracy, the State need only prove that Wurbs, with intent that the offense of theft be committed, agreed with another to hold the guns for reward and that an act was done in furtherance of that agreement.

■■ Wurbs testified that he knew the guns were stolen; that he contacted the owner on behalf of those in possession of the stolen guns; and that he made arrangements for the return of the guns in exchange for a reward in which he was to share, by reason of his contract with those who were in illegal possession. "Balmer" was knowingly in possession of stolen property which he was *only* willing to surrender in exchange for money from Hubbard. Any money paid to "Balmer" would clearly

constitute a reward or ransom within the purview of section 15—3(c) (Ill. Rev. Stat. 1971, ch. 38, §15—3(c)). Under Wurbs' agreement (*not* made with Hubbard) but with "Balmer," he was to share in and receive a part of that reward which was to be illegally exacted by "Balmer." Wurbs was then to be rewarded, not by Hubbard, but by "Balmer." All of the elements necessary to the offense were therefore proven by defendant's own testimony. *People v. Pettitti,* 337 Ill. 625, 169 N.E. 749.

Defendant claims that if his conduct constituted the offense of conspiracy no attorney could represent a criminal client since the attorney would have a duty to immediately notify the police concerning the activity and identity of his client. He argues that this would violate the attorney-client privilege.

■■ ■ It is clear beyond a doubt that no privilege attaches to communications in which a client seeks legal assistance to obtain illegal ends. *(United States v. Billingsly,* 440 F. 2d 823 (7th Cir. 1971).) Certainly there can be no duty that authorizes collaboration in crime or fraud. *(In re Carrol* (Ky. 1951), 244 S.W.2d 474.)

> "[T]he interests of public justice further require that no shield such as the protection afforded to communications between attorney and client shall be interposed to protect a person who takes counsel on how he can safely commit a crime." *Clark v. State* (Tex. Crim. App. 1953), 261 S.W.2d 339, 347.

> "Since the policy of the privilege is that of promoting the administration of justice, it would be a perversion of the privilege to extend it to the client who seeks advice to aid him in carrying out an illegal or fraudulent scheme. Advice given for those purposes would not be a professional service but participation in a conspiracy." McCormick, Evidence §95, at 199 (1972). See also A.B.A. Opinions of the Committee on Professional Ethics and Grievances, Opinion nos. 155, 156 (1957).

Defendant's status as an attorney cannot give him the right to do acts which would be criminal if performed by a layman. The record shows that Wurbs sought to protect and to further the interests of his client in obtaining money for the return of the stolen guns, which is an illegal act.

Whether defendant should have informed the law enforcement authorities of "Balmer's" contact or whether he could have merely advised "Balmer" not to proceed and told him he would not represent him is certainly not the question before this court. (See A.B.A. Standards on Criminal Justice, the Defense Function §3.7(b) (Approved Draft 1971).) An attorney's license is not a permit which allows participation in a criminal act without liability.

Defendant argues that the trial court committed error by refusing to instruct the jury on the defense of entrapment. He argues that evidence

Hubbard and Rosenberg attempted to get defendant to recommence negotiations after August 1, 1972, is evidence of entrapment.

The defense of entrapment is defined in section 7—12 of the Criminal Code (Ill. Rev. Stat. 1971, ch. 38, §7—12).

> "A person is not guilty of an offense if his conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of such person. However, this Section is inapplicable if a public officer or employee, or agent of either, merely affords to such person the opportunity or facility for committing an offense in furtherance of a criminal purpose which such person has originated.

■■ Defendant denies that he has committed an offense. It is the general rule that the defense may not deny commission of the offense and yet claim entrapment. *(People v. Fleming,* 50 Ill. 2d 141, 277 N.E.2d 872.) It can be argued that the defense should be permitted where defendant admits the acts but denies that his acts constitute an offense. (See Groot, *the Denial of Crime and Entrapment Defense,* 1973 U. Ill. L.F. 254.) We find it unnecessary to consider this question since we agree with the trial court that there was no evidence on which the question could be submitted to the jury. *(People v. Deppert,* 15 Ill. App. 3d 361, 304 N.E.2d 499; *People v. Guagliata,* 362 Ill. 427, 200 N.E. 169.) The statute specifically states that the defense is inapplicable if the criminal purpose originates with defendant and the public officers merely afford an opportunity to commit it. The evidence in the instant case indisputably shows defendant Wrubs instituted contact without any official encouragement by his phone call to Hubbard on July 19, 1972. As of that moment the offense had been committed. There was no entrapment since there was no official incitement of that act. Accordingly it was not error to refuse the instruction.

The court submitted two forms of verdict to the jury. One form, which was returned by the jury, finds both defendants, Wurbs and McCray, guilty of conspiracy to commit theft. The other form permitted the jury to find both defendants not guilty. efendant argues that since there were two defendants and two counts in the indictment, at least eight verdict forms were required so that the jury could find separately for each defendant on each count.

■■ Where only two persons are alleged to have participated in a conspiracy, as is true in the case at bar, the jury must find both guilty. Otherwise neither is guilty since a defendant cannot be convicted of conspiring with himself. *(People v. Bryant,* 409 Ill. 467, 100 N.E.2d 598.) Thus verdict forms which required the jury to find both defendants guilty or both not guilty were proper.

■■ Although separate verdicts are required when distinct offenses are

charged in separate counts, when several counts merely stated the same transaction in different forms a general verdict is sufficient. *(People v. Diekelmann,* 367 Ill. 372, 11 N.E.2d 420.) Contrary to defendant's assertion, the two counts were not "diametrically opposed and mutually exclusive." Both involved the same transaction and the only difference between the counts was the specific subsection of the theft statute alleged to have been violated. Ill. Rev. Stat. 1971, ch. 38, §16—1(d)(1), (d)(3).

Accordingly, for the reasons stated above the judgment of the circuit court of Macon County is affirmed.

Judgment affirmed.

TRAPP, P. J., and GREEN, J., concur.