*In re* MARRIAGE OF DEBRA GRANGER, Petitioner-Appellant, and DONALD GRANGER, Respondent-Appellee.

Fifth District   No. 5—89—0283

Opinion filed April 17, 1990.—Rehearing denied May 15, 1990.

Storment & Read, of Belleville, for appellant.

Roza Gossage, of Belleville, for appellee.

JUSTICE HARRISON delivered the opinion of the court:

Petitioner, Debra Granger, appeals from an order of the circuit court of St. Clair County which (1) vacated the judgment dissolving her marriage to respondent, Donald Granger, and ordered that a new trial be held "as to all issues other than the dissolution of the bonds of matrimony," and (2) set aside a "gag order" it had entered in the case on her behalf. As grounds for her appeal, petitioner argues that the circuit court erred in setting aside the dissolution judgment and ordering a new trial because, in making its decision, the court improperly relied on evidence which was protected by the attorney-client privilege. Petitioner further argues that the circuit court was without the power or jurisdiction to modify or dissolve its "gag order." For the reasons which follow, we find these arguments to be wholly without merit. We therefore affirm.

The record before us shows that on January 5, 1989, the circuit court entered a judgment dissolving the marriage between petitioner and respondent. Post-trial motions filed by the parties were denied on March 28, 1989. Respondent's attorney then set about reviewing the proceedings which had taken place in the case in order to determine if there was any basis for an appeal. Numerous hearings had apparently been held prior to entry of the judgment of dissolution, and some, if not all, of those hearings had been tape-recorded by the circuit court on the court's audio equipment. To expedite the process and to try to minimize the cost to her client, respondent's attorney began her review of the case by listening to these tapes. Chief Judge Stephen Kernan gave respondent's attorney authorization to listen to the tapes using the court's audio equipment.

Among the tapes which respondent's attorney reviewed was one of a hearing conducted on March 19, 1988. At the beginning of that hearing the judge in the case had directed that the tape-recording device in the courtroom be turned on, and there is no dispute that all of the parties to the hearing were aware that the proceeding was being recorded. During the course of the hearing, respondent called as a witness a man named Moody, who testified, *inter alia*, that petitioner had given the parties' infant child alcohol (a "wine cooler") to drink and that Moody and petitioner had had sexual relations in the "Camelot Inn" motel while the parties' child was on a bed next to them. This testimony apparently came as a surprise to petitioner's attorney, Paul M. Storment, Jr., who requested a five-minute recess so that he could consult with his client before conducting his cross-examination.

During the recess, Storment and his client remained in the courtroom. Although the judge stepped outside, the tape-recording device

was not turned off. Distracted by the damaging testimony which had been presented by Moody, Mr. Storment seems to have lost sight of the fact that he and his client were seated next to a live microphone, and he proceeded to have the following discussion with petitioner, all of which was recorded by the court's audio equipment.

"MR. STORMENT: This guy, is he broken hearted because you flushed him? Did you flush this guy down the drain?

MS. GRANGER: (Inaudible.)

MR. STORMENT: You're not friends?

MS. GRANGER: No.

MR. STORMENT: Cut your God-damn ass off before he really hurts you bad.

MS. GRANGER: Yeah, I know.

MR. STORMENT: Okay. Now, you're going to have to say that—who did you meet, the last guy you meet—the last guy you meet?

MS. GRANGER: Darnell.

MR. STORMENT: Darnell. Did he have desires for you? Did you cut his (inaudible) off?

MS. GRANGER: Yes, that's him. I stopped seeing him when I got married.

MR. STORMENT: Okay.

MS. GRANGER: And, the only reason I was seeing him was because I filed for my divorce.

MR. STORMENT: Did he know you were separated?

MS. GRANGER: Yeah.

MR. STORMENT: What about this business about the booze though? What about the business about the Camelot Inn? Did that happen?

MS. GRANGER: Yeah, it happened.

MR. STORMENT: God-damn. What were you thinking about?

MS. GRANGER: She was only three months—I mean 18 months. I couldn't leave him. I don't know. I don't know.

MR. STORMENT: You better deny it. Eighteen months old, Jesus.

MS. GRANGER: Well, she wasn't even 18 months in '86. She was a little bitty baby. She was still in diapers. She was born in '85, in '84, December of '84. In '85, she was about a year, but I was not seeing him in '86 because right after the Court date, right after my court date, me and Darnell still were talking, and I did see him then.

MR. STORMENT: So, that didn't happen in October of '86?

MS. GRANGER: No, it wouldn't have been October.

MR. STORMENT: You better deny this, buddy. You better deny it. What about the liquor situation? You told me you didn't even drink.

MS. GRANGER: I drink socially.

MR. STORMENT: That's drinking.

MS. GRANGER: This was the first time I drank socially.

MR. STORMENT: But, anyway, what about this liquor with Morgan?

MS. GRANGER: I let her taste it, but I mean, no, I wouldn't feed it to her.

MR. STORMENT: You let her taste it? What about this? What is the reason for that? Was he jealous or were you jealous or what happened? What happened in '79?

MS. GRANGER: Well, we never did really get along very well, and then one night I told him that I wanted us to just be friends, and he got violent, and he tore off my clothes.

MR. STORMENT: That's in '79?

MS. GRANGER: Yeah, around that time. I was laying in the bed. I called my mother because I asked him to go home, and he wouldn't go home. So, I called my mother, and they came over.

MR. STORMENT: What did he look like, he had been drinking? He smelled like booze?

MS. GRANGER: I don't know. He drinks.

MR. STORMENT: But, this was a business on the fact that you didn't want to be—you didn't want to go out with him anymore, right?

MS. GRANGER: Right. And, then this pure aggravation, that was just the way I release my frustration, but I never attacked anybody.

MR. STORMENT: Why did you scream and holler at him for?

MS. GRANGER: I didn't scream and holler at him. I would basically just go in another room, just go in to release your frustrations. I'd go in the bathroom, ahh, just like that and come back out. I'm serious. I usually roll down the window. I'm not a violent person. I'm really not, but I mean, I'm on the bottle when I'm attacked.

MR. STORMENT: This is damning. This is damning, damning. I don't know what you're going to do with that, but you're

going to have to do something with that. You're going to have to do something with that because that's going to cost you, man. It could cost you custody right there.

MS. GRANGER: I guess. I don't know.

MR. STORMENT: That could cost you the custody of your child right there. I mean, that's terrible. That's terrible. So, you better do something with that. Maybe the Judge won't believe that. You're awful classy.

MS. GRANGER: What can I do? I mean I was seeing him, and I was separated from him.

MR. STORMENT: Yeah, but I think the thing that hurts you is taking the kid in the room and screwing with the kid in the room. He said that you two had sex in the bed next to your kid, your little kid that was in the other bed. You're going to have to do something with that.

MS. GRANGER: What can I do with it? (Inaudible.)

MR. STORMENT: I don't know. That's up to you. It could be your word against his. It's up to you.

MS. GRANGER: Are you saying if I deny it then—

MR. STORMENT: If you said it didn't happen, it didn't happen.

MS. GRANGER: I remember it happening in '86. It seemed to me she was in diapers. She was little. I've left him so many different times, except the first time I filed was in '85, right?

MR. STORMENT: Yeah, but think of your judgment like that, screwing some guy in a motel with your daughter in the other bed next to you. She recognized her mother, didn't she?

MS. GRANGER: Well, she was little bitty. We're talking about little. We're talking about pampers.

MR. STORMENT: Well, what are you going to say about that? Are you going to deny that or not?

MS. GRANGER: I don't know.

MR. STORMENT: Hum?

MS. GRANGER: I don't know.

MR. STORMENT: Well, it's up to you. It's up to you. You're telling the truth when you say it didn't happen in '86. Okay.

MS. GRANGER: I don't remember it happening in '86, no.

MR. STORMENT: This guy crucified you.

MS. GRANGER: I know."

Following this exchange, court reconvened and Mr. Storment called petitioner as a witness. His examination of her included the following series of questions and answers:

"MR. STORMENT: Okay. Now, in 1986, why—what would possess [Moody] to tell that you went to a motel with him, with your daughter?

MS. GRANGER: I don't know.

MR. STORMENT: Did you think he was your friend?

MS. GRANGER: Yes.

MR. STORMENT: What was the situation with him when you met Darnell when you were separated? Were you going out with Moody?

MS. GRANGER: No, I wasn't.

MR. STORMENT: You dumped him for Darnell?

MS. GRANGER: No, I wasn't dating anyone.

MR. STORMENT: You weren't dating anyone?

MS. GRANGER: No.

MR. STORMENT: Do you ever—under oath now, do you ever remember going to a motel with your daughter with Mr. Moody?

MS. GRANGER: No.

MR. STORMENT: That's a lie, isn't it?

MS. GRANGER: Yes.

MR. STORMENT: What would possess him to tell that?

MS. GRANGER: I don't know. Mr. Moody did call me at work hollering and screaming at me. He told me that I had told Donald—.

MR. STORMENT: Give us a time. When did Mr. Moody holler and scream?

MS. GRANGER: I would say it must have been the early part of this year. I would say maybe March, sometime in March he called me at work, and he told me that Mr. Granger had gotten in contact with him and he had talked with him, and I had told him all these things, and he was just constantly—he was just basically hollering and screaming at me, and I didn't really know what he was talking about. And, in terms of me giving any information to Mr. Granger about Mr. Moody, I did tell him at one time that I had dated Mr. Moody, and that, that was the first time that I had ever received a black eye because Mr. Moody did hit me in my eye, and that was the first and only time that I had a black eye.

MR. STORMENT: Okay. Now, how old would your daughter have been in 1986? All this seemed to have happened according to Mr. Moody in October of '86, the Seagrams Cooler and the Camelot Inn.

MS. GRANGER: She would have been—in October she would have been almost two. She would have been—.

MR. STORMENT: Terrible two's?

MS. GRANGER: She was almost two, yeah.

MR. STORMENT: Walking and talking and running around, is that correct?

MS. GRANGER: She was walking a little, yeah. She wasn't talking that much.

MR. STORMENT: Have you ever been in a Camelot Inn?

MS. GRANGER: Yes, sir, I have.

MR. STORMENT: When were you in a Camelot Inn?

MS. GRANGER: I've been there with Mr. Granger.

MR. STORMENT: So, that's when you were in a Camelot Inn was with Mr. Granger?

MS. GRANGER: Yes, Mr. Granger and I went to the Camelot Inn."

Petitioner was then cross-examined by respondent's trial attorney, Timothy Stubblefield, during which the following exchange took place:

"MR. STUBBLEFIELD: And, you were saying that this relationship [with Moody] just ended at your marriage?

MS. GRANGER: I did.

MR. STUBBLEFIELD; Okay. And, everything that [Moody] is saying after that about any sort of relationship is totally fabricated?

MS. GRANGER: I wouldn't say fabricated, no. We did talk.

MR. STUBBLEFIELD: You did go out?

MS. GRANGER: After my separation from Mr. Granger when I filed for my divorce.

MR. STUBBLEFIELD: But, you did go out?

MS. GRANGER: We went riding. We went shopping.

MR. STUBBLEFIELD: This was all platonic?

MS. GRANGER: Yes.

MR. STUBBLEFIELD: So, everything [Moody] said today was just fabricated—.

MR. STORMENT: Objection, some of it wasn't fabricated. The motel incident she said was fabricated.

MR. STUBBLEFIELD: Everything relating to a sexual nature after 1984 was fabricated, correct?

MS. GRANGER: Yes."

Once respondent's attorney heard this tape, she realized that petitioner had committed perjury and that she had done so at the urging of her attorney. Based upon the contents of the tape, which respond-

ent's attorney had transcribed, respondent filed a motion in the circuit court requesting, *inter alia*, that a new trial be conducted on the issues of child custody and property division between the parties. Although this motion did not specify that a new trial was being sought pursuant to section 2—1401 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—1401), respondent's attorney subsequently indicated to the circuit court that that statute was the basis for her request for a new trial, and there is no dispute that respondent's motion was proper under that statute.

Petitioner responded immediately by filing what her attorney denominated as a "Petition for Temporary Restraining Order, Injunction and Gag Order." As grounds for that motion, petitioner claimed that the portion of the court's tape recording of the March 19, 1988, hearing which included her conversation with her attorney during the recess was obtained in violation of section 14—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 14—2), which prohibits eavesdropping, and that the contents of the conversation she had with her attorney should be protected from disclosure based on attorney-client privilege. She therefore requested that the circuit court enter an order (1) "prohibiting further publication and use of" the conversation between petitioner and her attorney which was recorded during the recess at the 1988 hearing, (2) enjoining respondent from "using any conversations between Donald Granger [*sic*] and her attorney" as a basis for any motion to change custody, and (3) "prohibiting Donald Granger from further publishing any knowledge he has in regard to conversations which may have occurred between Debra Granger and her attorney."

A hearing on the foregoing motions was conducted on April 20, 1989. At that hearing, testimony was adduced from the attorneys for both petitioner and respondent regarding the tape recording made of the 1988 hearing. Respondent's attorney, Roza Gossage, explained how she had come to listen to the recording and how it had been transcribed. The transcript was then placed into evidence and was reviewed by the judge in the course of the hearing.

After reviewing the transcript and hearing the testimony and arguments by counsel, the circuit court indicated that it would take the matter under advisement. Pending further order of the court, however, the court verbally instructed respondent's attorney "not to tell anybody about what is in this [transcript]." She ordered respondent, himself, not to disseminate "it to anybody *** and not to discuss this issue with anyone outside of [his attorney]." The court instructed counsel to surrender all copies of the transcript, which were placed

under seal; she ordered that the "transcript that we had today made [*sic*] which is April 20, 1989, will be under seal of court until further order of court"; and she ordered the court reporter not to discuss the matter "with anyone outside of the normal course of her duties as official stenographer of the court." The court granted this interim relief in order to preserve the status quo so that she could study the law more carefully before making a final decision.

That decision came the following day, April 21, 1989, when the court entered a written order in which it found

> "that the information contained in the transcription of March 19, 1988, which has been filed with the court on April 20, 1989[,] cast[s] serious doubt about the truthfulness of the testimony of Debra Granger and the fundamental fairness of *** all [of] the proceedings before the Court in this matter; further, the information raises serious doubt about whether either party received a full and fair hearing."

Based on this finding, the court set aside the judgment of dissolution entered on January 5, 1989, as to all issues "other than the dissolution of the bonds of matrimony," and ordered that the parties receive "a new trial on the merits of this cause." The court further set aside that portion of the interim order it had entered the previous day which prohibited discussion of the contents of the transcription of the 1988 hearing. At the same time, the court reaffirmed that the transcription of the 1988 hearing should remain under seal of the court, but it held that "any party desiring a copy of said transcription to fulfill their ethical obligations under the Disciplinary Rules may petition the Court for a copy of said transcription." From this order petitioner now appeals.

■ On this appeal, petitioner argues: (1) that the circuit court's order should be reversed insofar as it set aside the oral "gag order" announced by the court on April 20, 1989, barring discussion of the contents of the 1988 trial transcript and (2) that the circuit court erred in granting respondent a new trial. Both of these issues are properly before this court. Under Illinois law, "gag orders" which restrain the parties and their attorneys from making extrajudicial comments about a pending civil matter are construed as injunctions. (*Cummings v. Beaton & Associates, Inc.* (1989), 192 Ill. App. 3d 792, 796, 549 N.E.2d 634, 637.) The portion of the April 21 order which set aside the "gag order" is therefore appealable pursuant to Supreme Court Rule 307(a)(1) (107 Ill. 2d R. 307(a)(1)), which authorizes interlocutory appeals as of right from orders "granting, modifying, refusing, dissolving, or refusing to dissolve or modify an injunction."

■ The circuit court's order granting respondent a new trial is likewise properly before us. Although orders granting new trials are generally not appealable unless leave to appeal has been granted by this court (107 Ill. 2d R. 306(a)(1)(i)), respondent's request for a new trial was made in the context of a petition under section 2—1401 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—1401). Orders granting relief prayed in a petition under that statute are appealable pursuant to Supreme Court Rule 304(b)(3) (107 Ill. 2d R. 304(b)(3)).

In support of her argument that the circuit court committed reversible error when, on April 21, 1989, it dissolved the "gag order" it had entered on the previous day, petitioner contends that once the circuit court entered the "gag order," it was powerless to alter that order in any fashion, absent a change in the conditions which prompted the order's issuance. This position is completely untenable. Petitioner bases her argument on *Bundy v. Church League* (1984), 125 Ill. App. 3d 800, 466 N.E.2d 681, but that case is inapposite. *Bundy* involved a situation where the circuit court attempted to *sua sponte* dissolve an injunction months after the injunctive order had become final. In the case before us, by contrast, the April 20, 1989, "gag order" had not yet become final when it was modified by the court's written order on April 21, 1989.

■ The April 20, 1989, order was strictly provisional in nature, and its sole purpose was to maintain the status quo until the trial judge had an opportunity to consider the case more thoroughly. This is clearly evident from even a cursory review of the transcript of the April 20, 1989, hearing, and for petitioner's attorney to suggest that the oral ruling made by the circuit court on April 20, 1989, was intended to be final in any sense strains the bounds of zealous advocacy. Because the April 20, 1989, order was not final and was not intended to be final, no possible basis exists for holding that the circuit judge acted improperly or exceeded her authority when she modified that oral ruling the following day.

The second argument raised by petitioner on this appeal, that the circuit court erred in granting respondent a new trial, must likewise fail. Petitioner bases her argument before this court solely on the proposition that the evidence upon which the circuit court relied in ordering a new trial, the transcript of the 1988 hearing, contained statements and conversations which should have been protected from disclosure by the attorney-client privilege.

■ Although the circuit court did not make an express written finding regarding petitioner's claim of attorney-client privilege, the is-

sue was squarely presented to the circuit court, which evidently concluded, following an *in camera* review of the transcript of the tape of the 1988 hearing, that the privilege was inapplicable. As a preliminary matter, petitioner claims that such an *in camera* review was improper and that the circuit court had no right to read the transcript itself in determining whether the attorney-client privilege applied. We note that *in camera* inspections have been recognized as an appropriate mechanism for evaluating whether a communication between an attorney and his client is protected by the attorney-client privilege. (*Radiac Abrasives, Inc. v. Diamond Technology, Inc.* (1988), 177 Ill. App. 3d 628, 636, 532 N.E.2d 428, 433; *United States v. Zolin* (1989), 491 U.S. 554, 574, 105 L. Ed. 2d 469, 492, 109 S. Ct. 2619, 2632 (applying Federal common law).) Whether the use of such a procedure was proper here, however, need not be reached.

■ This is so because during the hearing before the circuit court, petitioner made no objection of any kind when the judge indicated that she would consider the contents of the transcript of the tape recording in ruling on the parties' respective motions. Although petitioner's attorney did indicate to the judge that he did not believe that it was necessary for her to read the transcript in ruling on the question of privilege, he voiced no complaint when the judge indicated that she was, in fact, going to read the transcript. Petitioner did not even challenge the propriety of the circuit court's *in camera* inspection of the transcript in either the main brief or reply brief which she filed in this appeal. The first time that the issue was raised at all by petitioner was at oral argument before this court. Under these circumstances, the issue must be deemed to have been waived. (113 Ill. 2d R. 341(e)(7).) We turn then to the question of whether the circuit court properly concluded that the attorney-client privilege did not apply here.

■ The attorney-client privilege exists in order that a client may consult freely with counsel without fear of compelled disclosure of information communicated by him to the attorney whom he has employed or seeks to employ. (*Radiac Abrasives, Inc. v. Diamond Technology, Inc.* (1988), 177 Ill. App. 3d 628, 634, 532 N.E.2d 428, 432.) The privilege applies not only to the communications of a client to his attorney, but also to the advice of an attorney to his client. (*United States v. King* (C.D. Cal. 1982), 536 F. Supp. 253, 261.) The attorney-client privilege does, however, have important limitations.

■ ■ The privilege does not attach where the communications between a client and her lawyer are in furtherance of a crime or fraud. (*Radiac Abrasives, Inc. v. Diamond Technology, Inc.* (1988),

177 Ill. App. 3d 628, 634, 532 N.E.2d 428, 432.) Accordingly, the privilege cannot be invoked to bar disclosure of communications in which a client seeks legal assistance to obtain illegal ends. (177 Ill. App. 3d at 634, 532 N.E.2d at 432.) Correspondingly, the privilege cannot be invoked to exclude evidence of an attorney's advice to his client where that advice is given in furtherance of illegal or fraudulent conduct. (*United States v. King* (C.D. Cal. 1982), 536 F. Supp. 253, 261.) As one leading authority has explained:

> "Since the policy of the privilege is that of promoting the administration of justice, it would be a perversion of the privilege to extend it to the client who seeks advice to aid him in carrying out an illegal or fraudulent scheme. Advice given for those purposes would not be a professional service but participation in a conspiracy." (E. Cleary, McCormick on Evidence §95, at 199 (2d ed. 1972), quoted in *People v. Wurbs* (1976), 38 Ill. App. 3d 360, 364, 347 N.E.2d 879, 893.)

Under this rule, known as the "crime-fraud exception," conversations in which an attorney recommends to his client that the client commit perjury are not entitled to protection by the attorney-client privilege. (See *United States v. Gordon-Nikkar* (5th Cir. 1975), 518 F.2d 972, 975.) That is precisely the situation we have before us in this case.

■ Petitioner's attorney has attempted to avoid this conclusion by characterizing the disputed statements and conversations here simply as a legitimate effort on his part to determine the facts from his client and to formulate a strategy to counter obviously damning testimony from an unexpected, adverse witness. We cannot accept this view. The statements and conversations captured on the tape recording made of the 1988 hearing have been set out in detail in this opinion. The clear import of those conversations and statements is that petitioner's attorney urged his client to commit perjury in order to save any chance she might have of obtaining an award of custody of the parties' child. There was nothing subtle or ambiguous about his approach. Indeed, we cannot recall a more blatant disregard for the provisions of Rule 7—102 of the Code of Professional Responsibility, which provides that in his representation of a client, a lawyer shall not "participate in the creation or preservation of evidence when he knows or when it is obvious that the evidence is false" (107 Ill. 2d R. 7—102(a)(6)) or "counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent" (107 Ill. 2d R. 7—102(a)(7)).

■ Counsel's violation of the canons of ethics is for other authorities to pursue. We note, however, that in advising his client to lie, petitioner's attorney did more than breach his ethical obligations.

He appears to have committed a criminal offense, attempt to suborn perjury. (See Ill. Rev. Stat. 1987, ch. 38, pars. 8—4 (attempt), 32—3 (subornation of perjury).) Had petitioner opposed her attorney's advice, this case would probably not be before us now. But she did not. On direct examination by her attorney and on cross-examination by respondent's counsel, petitioner willingly followed her attorney's recommendation. Without reservation and without hesitation, she clearly and unambiguously lied under oath, just as her attorney had suggested that she do during the conversation she had with him at the recess called by the circuit court following Moody's testimony. No possible claim could be made that petitioner did not know or should not have known that this course of conduct was unlawful. Accordingly, we must conclude that the statements and communications between petitioner and her attorney which were recorded on the tape of the 1988 hearing are not protected by any claim of attorney-client privilege. The circuit court therefore did not err when it considered the transcript of the tape in granting respondent's motion for a new trial.

For the foregoing reasons, the April 21, 1989, order of the circuit court of St. Clair County is affirmed.

Affirmed.

WELCH and HOWERTON, JJ., concur.