(No. 71259.—

*In re* MARRIAGE OF REBECCA KAY DECKER and PAUL R. DECKER (Kristen H. Fischer, Contemnor-Appellant).

*Opinion filed November 19, 1992.—Rehearing denied February 1, 1993.*

302

HEIPLE, J., dissenting.

Schaffner & Van Der Snick, P.C., of Geneva (Harry Schaffner, of counsel), for contemnor-appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Alison E. O'Hara, Assistant Attorney General, of Chicago, of counsel), for intervenor-appellee.

Gordon B. Nash, of Gardner, Carton & Douglas, Rene A. Torrado, Jr., of Vedder, Price, Kaufman & Kammholz, Muriel A. Kuhs, of Davis, Freedman, Zavett, Kane & MacRae, Steven F. Pflaum, of McDermott, Will & Emery, David J. Philipps, of Beeler, Schad & Diamond, Roseann Oliver, of Pope & John, Ltd., and Cornelia Honchar Tuite, all of Chicago, for *amicus curiae* Chicago Bar Association.

Maurice E. Bone and Dennis A. Rendleman, of Springfield, for *amicus curiae* Illinois State Bar Association.

JUSTICE CUNNINGHAM delivered the opinion of the court:

This appeal arises from Rebecca Kay Campbell's (petitioner's) motion in the circuit court of Champaign County seeking to compel Paul R. Decker's (respondent's) attorney, Kristen H. Fischer (contemnor), to disclose information concerning respondent's whereabouts. Petitioner suspected that respondent had abducted their child after visitation. The trial judge, Jeffrey B. Ford (intervenor), ordered contemnor to disclose any information she might have concerning respondent's intent to commit a crime, but contemnor refused, citing the attorney-client privilege. The court then held contemnor in direct

civil contempt for refusing to obey a direct order of the court, but stayed the order pending appeal. The appellate court affirmed the trial court's order (204 Ill. App. 3d 566), but also stayed the order to allow contemnor to purge the contempt by disclosing the information to the trial court. We granted contemnor's petition for leave to appeal (134 Ill. 2d R. 315), and allowed both the Illinois State Bar Association and the Chicago Bar Association to file *amicus curiae* briefs on behalf of contemnor.

The sole issue presented for review is whether the trial court erred in finding contemnor in direct civil contempt for her refusal, on the basis of attorney-client privilege, to answer the court's inquiries concerning her client. We find that the trial court erred in holding contemnor in direct civil contempt and reverse and vacate the contempt conviction.

On July 17, 1990, petitioner filed an emergency motion to amend child custody and compel disclosure of information. The motion alleged the following facts. Petitioner, formerly Rebecca Kay Decker, and respondent are the natural parents of K.L. Decker (K.L.). (The motion did not indicate whether petitioner and respondent are divorced or separated.) Petitioner has temporary custody of K.L. pursuant to a court order reaffirmed December 27, 1989. That same order gave respondent visitation rights with K.L. on alternate weekends, starting on Fridays at 6 p.m. and ending on Sundays at 6 p.m., and on Wednesday and Thursday during the school year, starting when school let out and ending at 7 p.m.

On Friday, July 13, 1990, respondent picked up K.L. from petitioner's home at 6 p.m., but failed to return the child on Sunday, July 15, 1990, at 6 p.m., the required time. At the time the motion was filed, respondent still had not returned K.L. to petitioner. Petitioner believed that respondent was not at his residence, and found that he had failed to report to work at his scheduled time.

Respondent had previously taken K.L. out of town without prior permission from the court or petitioner and was found to have violated the court's visitation order in that instance.

Petitioner believed that contemnor might have information concerning respondent's whereabouts, or information which might help find respondent. Petitioner asked the court to terminate respondent's visitation privileges and order respondent to return K.L. to petitioner. Petitioner also asked the court to order contemnor "to disclose any information in her possession which might lead to the discovery of Respondent's present whereabouts."

That same day, July 17, 1990, contemnor filed a response to petitioner's emergency motion. In her motion, contemnor stated that she did not know respondent picked up K.L. for visitation on July 13, 1990, or that he was not at his home and had failed to report for work. Contemnor also stated that any information she might have concerning respondent's whereabouts would be protected by the attorney-client privilege. Contemnor further noted in her motion that she had filed a motion to withdraw as respondent's counsel.

Contemnor's motion to withdraw as respondent's counsel, filed with the court on July 16, 1990, the day after respondent failed to return K.L. to petitioner, stated that contemnor conferred with respondent on July 11, 1990, and informed him that she had a conflict of interest with him. Contemnor also informed respondent that he should immediately retain new counsel. Contemnor learned that respondent had not returned K.L. to petitioner on July 16, 1990. Finally, contemnor stated that respondent had been acting against the advice of counsel and that counsel could no longer continue to represent respondent due to professional and personal ethics.

In addition to filing the emergency motion on July 17, 1990, petitioner served a subpoena upon contemnor commanding her to bring to the hearing on the emergency motion "[a]ny information in your possession relating to the addresses of any relatives of Paul R. Decker, the property addresses of any property owned by Paul R. Decker, the make, model and license plate of any vehicle owned or driven by Paul R. Decker, or any information as to where he has been or will be physically located beginning July 14, 1990, including any travel plans the said Paul R. Decker might have." Contemnor responded to this subpoena with a motion to quash, which argued that the subpoena violated the attorney-client privilege.

An emergency hearing concerning petitioner's motion was held on July 17, 1990. After noting contemnor's motion to withdraw as counsel, the court heard arguments concerning petitioner's request to amend child custody. The trial court denied that request and noted that the matter could be taken up at a later scheduled hearing. The court then heard arguments on petitioner's request to compel disclosure of information found in petitioner's motion and subpoena. Contemnor argued to the court that the attorney-client privilege would be violated by the request because the *"subpoena involving emergency motion* [was] very broad in its scope." (Emphasis added.) The court responded to this by discussing the Code of Professional Responsibility (Code) (in effect at the time of the contempt order). The court noted that the Code allowed an attorney to reveal a client's intent to commit a crime. The court then stated:

> " 'Confidences or secretes [*sic*] permitted under disciplinary rules required by law or court order.' That is vague, but I don't think that applies to this situation."

The court next asked what type of information petitioner was requesting, and noted that petitioner had requested information concerning respondent's automobile.

Petitioner's counsel informed the court that petitioner also sought the addresses of respondent's property. The court noted that this information should be produced, as a valid court order already existed for their production.

At this time, contemnor informed the court:

"Well, Your Honor, my position is, as to how get [*sic*] about this in proper format so that all things can be raised on the record appropriately, is that [petitioner's counsel] I think has not fully stated that which she is requiring me to do. If you look at the *emergency motion to compel*, there is allegations [*sic*] that I might have information which would lead to his whereabouts, and that I would have information as to intent. Also there is a request obviously to reveal information within my file. Now I think that what the Court needs to do based on the record at this point is *rule on the motion to quash*, either denying it or allowing it, and then go on to the next procedural step." (Emphasis added.)

The trial court responded:

"THE COURT: Well, *the motion to disclose* as far as the way it is stated in your *emergency motion*, *** is 'compel Ms. Fischer to disclose any information or possession in [*sic*] which might lead to the discovery of respondent's present whereabouts' I think is too vague. I think it is broad and general, and it could violate the attorney/client privilege. *So as to that, I think the motion to quash the subpoena for that is well taken.*" (Emphasis added.)

The court then ordered contemnor to produce the information concerning respondent's car and property addresses which petitioner's counsel had previously requested pursuant to discovery. Contemnor informed the court that she had produced all that she had in her file. The court replied: "I understand. That's the best you can do if that's what you have."

The court then stated:

"As to the motion to quash the subpoena, the subpoena is quashed. I think the request is too vague. ***

That's the best I can order Ms. Fischer to do."

After this, petitioner's counsel again questioned the court about the request for information concerning respondent's vehicle. The court noted that contemnor had certified that she had produced all the information she had, and that the court could not order her to produce any more. The court then stated:

"THE COURT: *** Of course, if Ms. Fischer has information of the intention to commit a crime, I think that she is under obligation to advise [petitioner's counsel] and the Court of that. Mr. Decker might not have confided in her as to that, although a crime may have been committed, there is also, if the allegations in the emergency motion are correct, it may be an ongoing crime. So if it is a [*sic*] ongoing crime, if Ms. Fischer has information of the intention, and I have to go back to the wording of the Supreme Court Rule, we are talking about the intention to commit a crime, we are not talking about anything else, then I think she has that obligation. *** Ms. Fischer, if you do have knowledge of the intention to commit a crime by Mr. Decker, then you should be advising the Court or [petitioner's counsel]. ***

[Contemnor]: *** *I want to do this procedurally correctly*, and I would ask that the Court then deny the motion to quash and go through with the subpoenas because I am not going to be in a position at this point where the Court has denied the subpoena and then turns around and says, but counsel, you are now under this affirmative obligation. I think it needs to be done on the record.

THE COURT: No, I don't think—I don't think you need that. I don't think you need a subpoena to do that. I think that when we are talking about the canons of professional responsibility that as an attorney, if you are directed by the Court to advise as to the intention to commit a crime, then you have that duty and obligation as a member of the bar, as a licensed attorney to practice in the state of Illinois. ***

[Contemnor]: May I take it at this point, Your Honor, that you are placing me under an order to disclose?

THE COURT: Yes.

[Contemnor]: Then I would indicate to the Court that I believe that to be a discretionary matter and I'm asserting the attorney/client privilege.

THE COURT: I think I need to ask, the attorney/client privilege as to specifically statements by Mr. Decker of his intention to commit a crime?

[Contemnor]: That is correct, in the absence of his presence here, or any other statements he would have made. ***

THE COURT: *** Before I proceed further, I need to know, are you in possession of statements by Mr. Decker of his intention to commit a crime?

[Contemnor]: I cannot answer that question, Your Honor. I assert the attorney/client privilege.

THE COURT: If you are ordered to do something and you assert the attorney/client privilege, then I will give you a chance to advise me as to what you think I should do at this point, being one, either an in camera finding outside of the other party to determine if this does come within the attorney/client privilege, give you a chance to do that, because I think the only other option I have is a finding of contempt. And before I get to that, I will give you the option either to have the determination either by this Court or by another Court to determine whether it is something that comes within the attorney/client privilege, so that even there could be a basis for finding in contempt. ***

[Contemnor]: *** Because I have asserted the attorney/client privilege, I obviously cannot allow an in camera conference and would not respond to an in camera conference.

THE COURT: Show at this time the Court finds that Attorney Kris Fischer, having been ordered by the court to comply with the Code of Professional Responsibility Rule 4—101, Subsection (d), Subsection 3, finds that said attorney refuses to provide the information as ordered under the Code of Professional Responsibility, citing attorney/client privilege. The Court further finds that Rule 4—101, sub. (d), sub. 3, is a section which disallows the

attorney/client privilege in this specific situation finding that the respondent is in contempt of court." (Emphasis added.)

The court found contemnor in direct civil contempt, and ordered her jailed until she disclosed the information. The court later entered a written order which stated that the court, after reviewing petitioner's verified motion, had "found reasonable grounds to believe a crime [had] been committed." (Emphasis added.) Contemnor's sentence was stayed pending appeal to the appellate court. The appellate court affirmed by finding that neither the attorney-client privilege nor the disciplinary code prevented contemnor from disclosing the information to the court. The appellate court believed that if an attorney had the discretion to refuse to disclose such information after being ordered by a court to do so, it would leave the determination of such material's status to the "whim" of the attorney. 204 Ill. App. 3d at 570.

On appeal to this court, contemnor acknowledges that the attorney-client privilege does not exist when an attorney is consulted to plan a crime. However, contemnor argues that the appellate court went far beyond this exception to the attorney-client privilege when it stated that an attorney's refusal to disclose information to the court upon court order would result in leaving the matter to the "whim" of the attorney. Contemnor argues that this is not "whim," but is instead required by the Code. According to contemnor, the appellate court's decision would make future client conferences subject to public revelation and would severely limit the role of attorneys to give prophylactic advice.

Contemnor also argues that the trial court's error was procedural in that it failed to require the necessary evidentiary threshold showing that the crime-fraud exception applied to the attorney-client privilege, a burden

on the one claiming the exception, before ordering the information disclosed. Contemnor further asserts that the trial court's offer of an *in camera* inspection would be nothing more than a "fishing expedition." Contemnor suggests that a workable rule of law is the following: If competent evidence suggests an attorney has been consulted in furtherance of a crime, the attorney-client privilege presumption is overridden and the attorney must testify. Contemnor finally argues that she was denied her due process rights when the trial court held her in contempt without prior notice.

Intervenor, on the other hand, argues that contemnor did not properly invoke the attorney-client privilege, as she failed to establish facts which would give rise to the privilege. Intervenor also argues that the privilege does not apply to a client's plans to engage in future criminal activity. Under the facts of this case, intervenor believes, it does not appear a response by contemnor to the "narrow" question posed by the trial court could have violated the attorney-client privilege. Moreover, intervenor argues, contemnor improperly refused to submit to an *in camera* examination of the information, an appropriate procedure for this type of situation, and under the facts of this case, such an examination would not be a "fishing expedition."

Intervenor also argues that the Code of Professional Responsibility did not authorize an attorney's refusal to comply with a court order demanding information regarding a client's intention to commit a crime. Intervenor believes that nothing under Rule 4—101 of the Code gave contemnor the discretion to disobey a court order. (107 Ill. 2d R. 4—101.) Instead, Rule 4—101 gave contemnor the authorization to disclose such information. Thus, under the Code, contemnor could not claim an affirmative obligation to refrain from revealing that which she was permitted to reveal, and contemnor must yield

to a court order under Rule 4–101(d)(2) (107 Ill. 2d R. 4–101(d)(2)). If contemnor had her way, intervenor argues, an attorney's judgment would be above the court's on such matters. Intervenor believes that contemnor seeks to be the exclusive judge of both her client's right and ability to rely on the attorney-client privilege, but neither the common law nor the rules of this court authorize her to do so. Intervenor concludes by arguing that the trial court did not deny contemnor her due process rights.

We begin our analysis with a discussion and comparison of the common law attorney-client privilege and the rules of confidentiality found in the Code and the current Illinois Rules of Professional Conduct (Rules) and discuss whether either one would prevent contemnor from ever revealing the information the trial court sought.

## I. COMPELLED DISCLOSURE OF CLIENT INFORMATION

### A. Attorney-Client Privilege

The attorney-client privilege is an "evidentiary privilege [which] provides limited protection to communications from the client by prohibiting their unauthorized disclosure in judicial proceedings." (Annotated Model Rules of Professional Conduct R. 1.6, at 90 (2d ed. 1992).) The privilege is recognized as one of "the oldest of the privileges for confidential communications known to the common law." (*Upjohn Co. v. United States* (1981), 449 U.S. 383, 389, 66 L. Ed. 2d 584, 591, 101 S. Ct. 677, 682; see generally Hazard, *An Historical Perspective on the Attorney-Client Privilege*, 66 Calif. L. Rev. 1061 (1978).) The purpose of this privilege is to enable a person to consult freely and openly with an attorney without any fear of compelled disclosure of the in-

formation communicated. (*Consolidation Coal Co. v. Bucyrus-Erie Co.* (1982), 89 Ill. 2d 103, 117-18; *People v. Adam* (1972), 51 Ill. 2d 46, 48.) The privilege has been described as being essential "to the proper functioning of our adversary system of justice." (*United States v. Zolin* (1989), 491 U.S. 554, 562, 105 L. Ed. 2d 469, 485, 109 S. Ct. 2619, 2626.) It is well established that the privilege belongs to the client, rather than the attorney, although the attorney asserts the privilege on behalf of his client. Thus, only the client may waive this privilege. See *People v. Ryan* (1964), 30 Ill. 2d 456.

A major exception to the attorney-client privilege exists, however, and that is the crime-fraud exception, which applies when a client seeks or obtains the services of an attorney in furtherance of criminal or fraudulent activity. (*People v. Wurbs* (1976), 38 Ill. App. 3d 360, 364; *Lanum v. Patterson* (1909), 151 Ill. App. 36, 38.) The rationale for this exception is that in seeking legal counsel to further a crime or fraud, the client does not seek advice from an attorney in his professional capacity. As stated in *State v. Phelps* (1976), 24 Or. App. 329, 545 P.2d 901:

> " 'In order that the rule [of privilege] may apply there must be both professional confidence and professional employment, but if the client has a criminal object in view \*\*\* one of these elements must necessarily be absent. The client must either conspire with his [counsel] or deceive him. If his criminal object is avowed, the client does not consult his adviser professionally, because it cannot be the [lawyer's] business to further any criminal object. If the client does not avow his object, he reposes no confidence \*\*\*. The [lawyer's] advice is obtained by a fraud.' " (*Phelps*, 24 Or. App. at 334-35, 545 P.2d at 904, quoting *Queen v. Cox* (1884), 14 Q.B. 153, 168.)

Thus, where the crime-fraud exception applies, no attorney-client privilege exists whatsoever, and the communication is not privileged.

We note, however, that not all discussions between attorneys and their clients about possible illegal activities come within the crime-fraud exception to the attorney-client privilege. As our appellate court has noted:

> " '[I]n order to invoke the exception to the privilege, the proponent of the evidence must show that the client, when consulting the attorney, knew or should have known that the intended conduct was unlawful. Good-faith consultations with attorneys by clients who are uncertain about the legal implications of a proposed course of action are entitled to the protection of the privilege, even if that action should later be held improper.' *State ex rel. North Pacific Lumber Co. v. Unis* (1978), 282 Or. 457, 464, 579 P.2d 1291, 1295." *Radiac Abrasives, Inc. v. Diamond Technology, Inc.* (1988), 177 Ill. App. 3d 628, 635.

### B. Rule of Confidentiality

In addition to the attorney-client privilege, there exists the attorney's rule of confidentiality, which encompasses the attorney-client evidentiary privilege as well as the attorney's fiduciary duty to his client. (See Annotated Model Rules of Professional Conduct R. 1.6, at 88 (2d ed. 1992).) The rule of confidentiality sets forth what an attorney may, may not, or must ethically reveal about his client. Unlike the evidentiary attorney-client privilege, the rule of confidentiality applies not only during judicial proceedings, but at all times, and to client's secrets, as well as confidences. (Annotated Model Rules of Professional Conduct R. 1.6, at 86, 90 (2d ed. 1992).) The rationale for this rule is the following:

> "Both the fiduciary relationship existing between lawyer and client and the proper functioning of the legal system require the preservation by the lawyer of confidences and secrets of one who has employed or sought to employ him. A client must feel free to discuss whatever he wishes with his lawyer and a lawyer must be equally free

to obtain information beyond that volunteered by his client. A lawyer should be fully informed of all the facts of the matter he is handling in order for his client to obtain the full advantage of our legal system. \*\*\* The observance of the ethical obligation of a lawyer to hold inviolate the confidences and secrets of his client not only facilitates the full development of facts essential to proper representation of the client but also encourages laymen to seek early legal assistance." Model Code of Professional Responsibility EC 4—1 (1988).

This attorney's rule of confidentiality in Illinois was formerly contained in Rule 4—101 of the Code (107 Ill. 2d R. 4—101), in effect at the time of the contempt order, and is presently found in Rule 1.6 of the Rules (134 Ill. 2d R. 1.6). Rule 4—101 provided in pertinent part:

"(a) 'Confidence' refers to information protected by the attorney-client privilege under applicable law, and 'secret' refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing to or would likely be detrimental to the client.

(b) Except when permitted under Rules 4—101(c) and (d), a lawyer shall not knowingly, during or after termination of the professional relationship to his client,

(1) reveal a confidence or secret of his client;

\* \* \*

(c) A lawyer shall disclose information about a client to the extent it appears necessary to prevent the client from committing an act that would result in death or serious bodily harm to another person, and to the extent required by law or the rules of professional conduct.

(d) A lawyer may reveal
\*\*\*

(2) confidences or secrets when permitted under disciplinary rules or required by law or court order;

(3) the intention of a client to commit a crime in circumstances other than those enumerated in paragraph (c) above." (107 Ill. 2d R. 4—101.)

Rule 1.6 contains similar language. The following analysis will thus apply to Rule 1.6 as well as Rule 4—101.

### C. Analysis of the Attorney-Client Privilege and the Rule of Confidentiality in this Case

We now address the issue of whether the attorney-client privilege or the rule of confidentiality would ever prevent an attorney from disclosing information of the type requested by the trial court in this case. For purposes of this analysis, we will assume that the information sought to be disclosed was properly found by the trial court not to be privileged under the crime-fraud exception.

We start with the attorney-client privilege, and note that if in fact respondent met with contemnor and sought her services in furtherance of criminal activity, child abduction, knowing such action was illegal, the communication would not be privileged under the well-established crime-fraud exception to the attorney-client privilege. Thus, contemnor could not refuse to disclose, by asserting the attorney-client privilege, the nonprivileged contents of that communication after being ordered to do so by the court.

The more difficult issue, however, is whether the rule of confidentiality gives an attorney the discretion to refuse to disclose such information after a court has properly determined that the information is not privileged and has ordered the attorney to disclose the information. Rule 4—101(c) provided that an attorney *shall* disclose information that would be necessary to prevent a client from committing a crime resulting in death or serious bodily harm. Rule 4—101(c) is mandatory. However, Rule 4—101(c) was not applicable here as no allegation was made that respondent's failure to return the minor child would result in death or serious bodily harm.

Rule 4—101(d)(3) provided that an attorney *may* reveal the intention of a client to commit a crime when the crime would not involve death or serious bodily harm. Rule 4—101(d)(3) is discretionary. Here, contemnor had the discretion to inform, on her own initiative, the proper parties of any intent respondent might have had to commit a crime not involving death or serious bodily harm, such as child abduction.

Finally, Rule 4—101(d)(2) provided that an attorney *"may"* reveal "confidences or secrets when *** *required* by law or court order." (Emphasis added.) (107 Ill. 2d R. 4—104(d)(2).) It is this rule which poses a problem in this case. Contemnor argued below, and the Illinois State Bar Association argues in its *amicus* brief before this court, that Rule 4—101(d)(2) is also discretionary, and that an attorney need not disclose client information upon a court's order, even if it is not privileged under the attorney-client privilege. This argument is based on the phrase "A lawyer *may* reveal," found in Rule 4—101(d)(2). (Emphasis added.) The argument is that the permissive word "may" was used in Rule 4—101(d)(2), and not the mandatory "shall," as in Rule 4—101(c). Intervenor, on the other hand, claims that such disclosure is mandatory upon court order, and that Rule 4—101(d)(2) only relieves the attorney of discipline when forced to disclose such information by a court.

We conclude that an attorney must, when directed by final court order, and after the court has properly determined that information is not privileged, disclose the information to the court. To hold otherwise would place an attorney's discretion above judicial determination of the matter. In concluding this, we note that the focus here should not be on the word "may," found in Rule 4—101(d)(2), but instead on the phrase "when *** *required* by law or court order." (Emphasis added.) This latter language is clearly mandatory, and nothing in the Code

or Rules allows an attorney to disobey a court order. There is a difference between an attorney's voluntarily choosing not to disclose nonprivileged information and an attorney's refusing to disclose nonprivileged information after the court has ordered the attorney to do so. Thus, rather than being discretionary, Rule 4—101(D)(2) simply instructs attorneys that they will not be disciplined for revealing confidences or secrets when *required* by law or court order.

Professor Hazard has described this rule as the "required by law" exception to the rule of confidentiality. Hazard notes that it would be inconceivable for a legal system which has just ordered an attorney to disclose information to not allow that information divulged pursuant to a code of ethics. (See 1 G. Hazard & W. Hodes, The Law of Lawyering §1.6:112, at 147 (Supp. 1991).) Hazard also notes that while the American Bar Association's Model Rule 1.6 does not include this "required by law" exception, the annotations to the Model Rules correctly acknowledge that an attorney still must comply with a final court order to reveal information. (1 G. Hazard & W. Hodes, The Law of Lawyering §1.6:112, at 147-48 (Supp. 1991); Annotated Model Rules of Professional Conduct R. 1.6, at 88 (2d ed. 1992).) Hazard concludes that once a court has determined that information is not privileged, and orders an attorney to disclose the information, the attorney is "freed from the constraints of ethical duty *** [and] disclosure thus becomes mandatory in order to comply with the court's ruling. *** Where the client's present activities are unlawful, neither the confidentiality principle nor the attorney-client privilege accords protection to information concerning those activities." 1 G. Hazard & W. Hodes, The Law of Lawyering §§1.6:108, 1.6:109, at 142.3, 142.4 (Supp. 1991).

An identical issue was presented in *Fellerman v. Bradley* (1985), 99 N.J. 493, 493 A.2d 1239, where an attorney refused to reveal a client's address to the court. The attorney cited both the attorney-client privilege and New Jersey's rule of confidentiality, which has provisions identical to Illinois' Rule 4—101(d), as reasons for not disclosing the information. The supreme court of New Jersey, after finding the crime-fraud exception to the attorney-client privilege applicable to the communication of the address in that case, addressed the attorney's argument that New Jersey's rule of confidentiality, DR 4—101, made disclosure discretionary. The court there stated:

"Disciplinary Rule 4—101(B) requires that an attorney not reveal 'a confidence or secret of [his] client.' The Disciplinary Rule defines a 'confidence' as 'information protected by the attorney-client privilege under applicable law.' DR 4—101(A). However, if the fraud exception to the attorney-client privilege applies to the particular communication, then the communication could not be considered to be a 'confidence' protected from disclosure under the privilege. In this case, we have held that the fraud exception applies to defendant's address. Consequently, it is a communication that cannot be protected as a 'confidence' under Disciplinary Rule 4—101.

Disciplinary Rule 4—101(B) also protects from disclosure a client's secret. It defines a 'secret' as 'other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.' DR 4—101(A). It appears then that under the Disciplinary Rule there is some distinction between a 'confidence' and a 'secret.' *** The question becomes whether it is disclosable under Disciplinary Rule 4—101(C)(2).

Disciplinary Rule 4—101(C)(2) permits the disclosure of such secrets 'when *** required by law or court order.' The conclusion that the attorney must comply with the

trial court's order in this case is entirely appropriate. [Citations.] The withholding of this information would frustrate compliance with a court judgment \*\*\*. \*\*\* This result would permit a party 'to mock justice' by ignoring both a judgment and a separate enforcement order \*\*\*, with none of the policies underlying the rationale for protecting a client's secrets advanced in the process. These circumstances clearly permit the revelation of defendant's address under Disciplinary Rule 4—101(C)(2)." *Fellerman*, 99 N.J. at 507-09, 493 A.2d at 1247-48.

See also *Commonwealth v. Maguigan* (1986), 511 Pa. 112, 511 A.2d 1327.

The same is true here, as any intention to commit the crime of child abduction would not be a confidence protected by the duty of confidentiality, as the crime-fraud exception would apply. Moreover, if this information could be considered a secret under the Code and Rules, it must also be disclosed in this situation. In the instant case, as in *Fellerman*, the withholding of such information, again assuming respondent did confer with contemnor about his intent to commit the crime of child abduction, would frustrate the court order concerning visitation, as well as help further a possible ongoing crime, without advancing any of the policies for protecting the client's secrets. Such nonprivileged information thus must be disclosed, upon court order, under the Code and Rules.

## II. PROCEDURE TO DETERMINE STATUS OF ATTORNEY-CLIENT INFORMATION

While information like that the trial court sought here might have been the type which an attorney could not refuse to disclose upon court order, there must first be some showing that the information sought is in fact subject to disclosure. We now address the issue of what steps a trial court must take in determining whether such information is subject to disclosure. These steps will

serve to ensure that those communications which are in fact privileged will not be subject to revelation. It is at this point that the appellate court's analysis stopped, and is thus where it erred.

Before an attorney can be compelled to disclose client information, the party opposing the attorney-client privilege must first establish that the information is not privileged. Only then may the information be compelled:

> "The party opposing the attorney-client privilege has the burden of bringing the communication in question within the crime-fraud exception. \*\*\* Once the attorney-client privilege is defeated by the application of the crime-fraud exception[,] \*\*\* discovery of, or testimony regarding, the information in question may be compelled." Note, *The Impact of the Zolin Decision on the Crime-Fraud Exception to the Attorney-Client Privilege*, 24 Ga. L. Rev. 1115, 1121-22 (1990).

The question arises, however, as to what type of a burden the opposing party must meet to prove that certain communications fall within the crime-fraud exception to the attorney-client privilege. In *Clark v. United States* (1933), 289 U.S. 1, 77 L. Ed. 993, 53 S. Ct. 465, the United States Supreme Court stated:

> "There are early cases apparently to the effect that a mere charge of illegality, not supported by any evidence, will set the confidences free. [Citations.] But this conception of the privilege is without support in later rulings. 'It is obvious that it would be absurd to say that the privilege could be got rid of merely by making a charge of fraud.' [Citation.] To drive the privilege away, there must be 'something to give colour to the charge'; there must be 'prima facie evidence that it has some foundation in fact.' [Citation.]" (*Clark*, 289 U.S. at 15, 77 L. Ed. at 1000, 53 S. Ct. at 469.)

Another court has discussed the burden of proof required to establish the exception to the privilege:

"[T]here need only be presented a reasonable basis for believing that the objective was fraudulent. In [a previous case], we referred to the burden on the party seeking to overcome the privilege in terms of showing probable cause to believe that a crime or fraud had been committed and that the communications were in furtherance thereof. [Citation.] Other circuits have referred to the burden in terms of the need to make a prima facie showing. [Citations.] As a practical matter, there is little difference here between the two tests. Both require that a prudent person have a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof. [Citation.]" *In re Grand Jury Subpoena Duces Tecum* (2d Cir. 1984), 731 F.2d 1032, 1039.

While the opposing party must thus make some initial evidentiary showing to establish the exception, the question arises next as to what type of evidence the opposing party may use to prove the exception. It is often difficult to prove the crime-fraud exception to the attorney-client privilege using only evidence independent of the communication itself. The best, and often only, evidence of whether the exception exists is the allegedly privileged communication. However, if the communication itself is used to make the initial determination of whether the crime-fraud exception applies, the privilege is violated and the protected interest suffers because of the forced public revelation. See Note, *The Future Crime or Tort Exception to Communications Privileges*, 77 Harv. L. Rev. 730, 737 (1964).

The United States Supreme Court recently addressed this dilemma in *United States v. Zolin* (1989), 491 U.S. 554, 105 L. Ed. 2d 469, 109 S. Ct. 2619. At issue in *Zolin* was whether the crime-fraud exception applied to an assertion of the attorney-client privilege with respect to audio tapes. The Internal Revenue Service asked the district court to listen to the tapes *in camera* and deter-

mine whether the crime-fraud exception applied. The district court refused to listen to the tapes *in camera* and subsequently found the tapes protected by the attorney-client privilege, and that no crime-fraud exception existed.

In addressing the issue, the Supreme Court posed two questions: (1) whether *in camera* inspection of allegedly privileged information could ever be allowed; and (2) if so, would such inspections always be permissible, or would there first have to be some initial evidentiary showing. In response to the first question, the Supreme Court concluded that Federal courts could view the allegedly privileged materials *in camera* to determine whether information was in fact privileged. In concluding this, the Supreme Court noted that disclosure of such material to the trial court in such a manner does not waive or terminate the privilege. The Court also noted that the policies underlying the privilege and its exceptions were better fostered by permitting such review. The Court believed that the cost of an absolute bar of *in camera* viewing of such material would be intolerably high and too great an impediment to the adversarial system, as many blatant abuses of privilege cannot be substantiated by extrinsic evidence alone. *Zolin*, 491 U.S. at 568-69, 105 L. Ed. 2d at 488-89, 109 S. Ct. at 2629.

After making this determination, the Court addressed its second question and concluded that before an *in camera* inspection of allegedly privileged material could be made to determine whether the crime-fraud exception existed, there first had to be some threshold evidentiary showing to trigger such review. In concluding this, the Supreme Court noted that the trial court's view of the material itself may jeopardize the security the privilege was meant to protect. Moreover, the Court was concerned that unrestricted use of *in camera* inspections

would result in due process violations and would burden Federal courts with review of large evidentiary records. The Court was also concerned that "fishing expeditions" by the opposing side would take place, with the district courts acting as the opposing side's unwitting and unwilling agents. *Zolin*, 491 U.S. at 571, 105 L. Ed. 2d at 490, 109 S. Ct. at 2630.

Concerning the evidentiary threshold required to hold the *in camera* inspection, the Supreme Court noted that because an *in camera* inspection would be a smaller intrusion upon confidentiality than public disclosure, a lesser evidentiary showing would be needed to trigger the *in camera* inspection than to ultimately prove the crime-fraud exception. Thus, the Court stated that a " 'judge should require a showing of factual basis adequate to support a good faith belief by a reasonable person,' [citation] that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Zolin*, 491 U.S. at 572, 105 L. Ed. 2d at 490, 109 S. Ct. at 2631, quoting *Caldwell v. District Court* (Colo. 1982), 644 P.2d 26, 33.

The Supreme Court went on to note that once an adequate threshold showing has been made, the trial court then has the discretion to conduct the *in camera* inspection. In making this determination, the trial court should consider such things as the volume of materials it is asked to review, the relative importance of the information to the case, and the likelihood that *in camera* review of the material, along with other evidence, will support the crime-fraud exception. The trial court may also defer the *in camera* review if it believes other information, not allegedly privileged, will turn up later and support the crime-fraud exception. *Zolin*, 491 U.S. at 572, 105 L. Ed. 2d at 491, 109 S. Ct. at 2631.

We adopt the approach espoused in *Zolin* as a sensible solution to the problem of establishing the crime-

fraud exception to the attorney-client privilege. In doing so, however, we caution and instruct the trial courts of this State in a few areas. Because of the inherent problem involved in a trial court's viewing information that may in fact be privileged, and then later ruling on an issue which the privileged information may affect, it would be prudent, where possible, to have another trial judge conduct the *in camera* inspection once the initial threshold has been met and the court has determined that an *in camera* inspection is proper. We also caution that the trial court's *in camera* questioning should be as limited as possible to initially keep the actual information itself confidential. Thus, once the initial threshold has been met by the party advocating the crime-fraud exception, the *in camera* questioning by the judge should begin with a narrow question such as: "Did your client ask your advice on how to commit this [specific illegal] act, knowing it to be unlawful?" The answer to this question would subject the information to minimal disclosure, and an affirmative answer would remove the privilege for that information. (See Note, *The Future Crime or Tort Exception to Communications Privileges*, 77 Harv. L. Rev. 730, 738 (1964).) Finally, we note, as did the appellate court, that "in some circumstances, such as here, contempt procedures are an appropriate method by which to test orders which are collateral to the principal action." (204 Ill. App. 3d at 572.) Thus, when the attorney's refusal to disclose such information is in good faith, trial courts should consider staying any contempt order pending appellate review, as was done here.

In the instant case, the trial court erred in several ways when it ordered contemnor to disclose information concerning her client's intent to commit a crime. First, the trial court *sua sponte* questioned contemnor concerning her client after it had already denied petitioner's request to modify custody and her request to compel dis-

closure of information contained in her motion and subpoena. At this time, the court had disposed of all matters before it and had no basis to proceed and question contemnor. The court proceeded on the mistaken belief that contemnor had an affirmative duty under Rule 4–101(d)(3) (107 Ill. 2d R. 4–101(d)(3)) to disclose any intent of her client to commit a crime.

Regrettably, the dissent concludes that the trial court had not disposed of petitioner's request for information contained in her motion at the time the trial court ordered contemnor to disclose any information concerning her client's intent to commit a crime. The transcript of the hearing, however, belies this assertion. The trial court, as well as contemnor, treated the motion to compel disclosure of information and the subpoena as the same request. In making her argument to the court concerning petitioner's request, contemnor asserted that the "subpoena involving emergency motion [was] very broad in its scope." Contemnor then informed the court what information she believed petitioner sought in her motion, including any intent of her client to commit a crime, and asked the court to rule on petitioner's motion by ruling on contemnor's motion to quash. The trial court responded to contemnor's argument by addressing the request in petitioner's motion to compel disclosure of information. After reading that part of petitioner's motion into the record, the court stated that the request was too broad and general, and was possibly violative of the attorney-client privilege. The trial court then stated: "So as to that, I think the motion to quash the subpoena for that is well taken." The trial court accordingly denied petitioner's request to compel disclosure of information by stating that he was quashing the subpoena.

The transcript further reveals that both the trial court and contemnor proceeded on the belief that the trial court had denied petitioner all relief (except for the

information concerning respondent's automobile and property addresses which contemnor stated she did not have). After denying petitioner's requests, the trial court informed petitioner's counsel that he could not order contemnor to do any more. However, proceeding on the incorrect assumption that contemnor had an affirmative duty to inform the court and petitioner's counsel of any intent of respondent to commit a crime, the court informed contemnor that she "should" disclose such information to the court. Upon this request, contemnor asked the court to proceed correctly. By this, contemnor meant that the trial court should have first reversed its ruling quashing the subpoena so that the trial court would have had a basis for its order. Contemnor wanted the order to be "done on the record." The trial court disagreed with contemnor, but never informed her at the hearing that it was proceeding on petitioner's request in her motion to compel disclosure of information.

The trial court further erred by failing to find at the emergency hearing that an evidentiary threshold had been met which would require an *in camera* inspection of allegedly privileged material. While the dissent notes that the trial court stated that it found reasonable grounds to believe "a crime" had been committed, this finding was entered in the court's written order, after the hearing. Thus, the court never informed contemnor of this finding before ordering her to disclose information, offering her an *in camera* inspection, and holding her in contempt. The trial court's finding in its written motion further does not indicate that it suspected respondent informed contemnor of his intention to commit a crime, or what crime had been committed. The court's written order only found reasonable grounds to believe "a crime" had been committed.

Also, contrary to intervenor's and the dissent's assertion that the question posed to contemnor by the trial

court was "narrow," the question was extremely broad: "[A]re you in possession of statements by Mr. Decker of his intention to commit *a crime*?" (Emphasis added.) Allowing such an inquiry, without any finding of fact or limiting language, would allow any trial court, at any time in any proceeding, to ask any attorney whether her client had informed her of an intent to commit a crime. Such a fishing expedition is precisely what the Supreme Court warned of in *Zolin*.

We finally note here that the court's order was also in error because it ordered contemnor to disclose information pursuant to Rule 4—101(d)(3) (107 Ill. 2d R. 4—101(d)(3)), a rule which gave contemnor the discretion to inform the court of such information. The court had previously dismissed Rule 4—101(d)(2) (107 Ill. 2d R. 4—101(d)(2)), the required by law or court order exception to the rule of confidentiality, as being inapplicable in that situation.

We now address intervenor's claim that contemnor never properly invoked the attorney-client privilege since "one who claims to be exempt by reason of privilege from the general rule which compels all persons to disclose the truth has the burden of showing the facts which give rise to the privilege." (*Krupp v. Chicago Transit Authority* (1956), 8 Ill. 2d 37, 42; see also *Consolidation Coal Co.*, 89 Ill. 2d at 119.) Intervenor is correct in alleging that a mere assertion that a matter is confidential and privileged will not suffice to prove the privilege, if at all challenged by the opposing party. (See *Krupp*, 8 Ill. 2d at 42.) In this case, the court implicitly accepted the contemnor's assertion of attorney-client privilege by failing to contest it during the hearing, claiming only that the crime-fraud exception to the privilege was applicable. We conclude that when there is an attorney-client relationship in which an attorney and client have communicated in a professional capacity, as oc-

curred in this case, there is a rebuttable presumption that their communication is privileged. (See *Adam*, 51 Ill. 2d at 49.) If, however, the opposing party challenges the presumption, then the proponent of the privilege must prove the existence of the essential elements giving rise to the privilege. Because there is no evidence in the record that petitioner or intervenor has challenged the existence of the privilege, this argument is waived. As a result, we will not address whether the elements of the privilege were present, but will accept the presumption that they were.

Because we reverse and vacate the trial court's finding of contempt for the foregoing reasons, we need not address contemnor's claim that the court's contempt order violated her due process rights. Moreover, since the briefs indicate that the matter against respondent has been completed, we see no need to remand this cause for further proceedings. We thus do not decide whether the facts of this case presented sufficient evidence for petitioner to meet the initial evidentiary threshold required to conduct an *in camera* inspection of any communication between respondent and contemnor to determine whether the crime-fraud exception to the attorney-client privilege existed.

The judgments of the appellate and circuit courts are reversed.

*Appellate court reversed;*
*circuit court reversed.*

JUSTICE HEIPLE, dissenting:

A learned professor of the zoological sciences was performing tests on a frog. He observed that if he stood several feet behind the frog and clapped his hands sharply, the frog would jump three feet. The professor cut off the frog's left hind leg and repeated the hand clapping. This time the frog jumped only two feet. He

then cut off the frog's right hind leg and again clapped his hands. This time the frog didn't jump at all. The learned professor concluded that cutting off a frog's hind legs causes deafness.

The moral of the story is that it is possible to have almost everything right and still draw the wrong conclusion. So it is with the majority opinion in the instant case. The law is well stated and the facts are marshalled correctly. Unfortunately, however, the opinion draws the wrong conclusion.

This is a case which is grounded on a noncustodial former spouse, Decker, violating child visitation privileges by taking a child for visitation and then secreting the child and not returning him to the custodial parent. In a word, kidnapping.

Seeking information as to the child's whereabouts, the mother, as custodial parent, sought to depose Kristen H. Fischer, the lawyer for the noncustodial father. Fischer refused to answer any questions, based on the attorney-client privilege. The trial judge offered an *in camera* inquiry and further offered that the *in camera* hearing be conducted before a different judge. The lawyer again refused on the grounds of privilege. She was held in contempt and the appellate court, in a well-reasoned opinion, affirmed. 204 Ill. App. 3d 566.

As the majority opinion correctly notes, disclosures to a lawyer in furtherance of criminal or fraudulent activity are outside the protection of the attorney-client privilege. That is to say, such communications are not privileged. Neither are such communications protected by the rule of confidentiality.

What the trial judge sought in this case was to conduct an *in camera* inquiry of the lawyer to elicit any communication that was outside the privilege. In other words, if, for instance, the client had disclosed to his lawyer that he was planning to kidnap the child and take

him to some secret place, such a communication would not be privileged and would be discoverable.

The majority is apparently concerned that the trial judge may have been on a fishing expedition and failed to articulate a factual basis to support a good-faith belief that the crime-fraud exception applied. To the contrary, Judge Ford, the trial judge, stated:

> "The court has reviewed the Petitioner's verified motion and found reasonable grounds to believe that a crime has been committed."

The truth is, the facts overwhelmingly support Judge Ford's inquiry and order. Mr. Decker was with his child contrary to custody orders and was nowhere to be found. The hearing itself was an emergency hearing in response to Mr. Decker's failure to return the child. Fischer had recently filed a motion to withdraw as Mr. Decker's attorney, citing a number of reasons including acting against advice of counsel. Keeping in mind that the trial court had at the time of its order no directive from this court to make any particular factual finding before investigating the existence of an alleged attorney-client privilege, it is clear that the judge did all that was necessary to support his order compelling Fischer to co-operate with the questioning *in camera*. Any differences between what he did and the after-the-fact requirements that the majority opinion lays out today are insignificant and inconsequential.

The majority also finds error in the court's questioning of Fischer after it quashed Mrs. Decker's subpoena, claiming that it was an improper, *sua sponte* investigation. This results from a tortured reading of the proceedings, and again, the majority draws the wrong conclusion.

Judge Ford had three matters relating to this case before him on the day in question. One was Mrs. Decker's subpoena, and the other two were the requests con-

tained in Mrs. Decker's motion. Contrary to the majority's assertion that the two requests were treated as one matter, Fischer had provided two separate responses to these matters: a motion to quash the subpoena and a prayer to dismiss the motion.

Judge Ford denied Mrs. Decker's request to amend the child custody order, as he felt that such a modification would be premature. He also granted Fischer's motion to quash the subpoena on the grounds that it was too vague. However, there was still one matter to be considered: that part of the motion asking the court to compel Fischer to disclose information. The majority's thorough recitation of the proceedings underscores that this portion of the motion was not disposed of. As the majority points out, the judge said, "the motion to quash the subpoena is well taken," and then, "[a]s to the motion to quash the subpoena, the subpoena is quashed." (Emphasis omitted.) (153 Ill. 2d at 307.) The trial judge had not ruled on the contemnor's prayer to dismiss the motion to compel disclosure.

It was on this final matter that Judge Ford asked his questions. This was not *sua sponte*, but rather in direct response to a motion before him on that day. In order to decide whether the motion to compel disclosure should be granted, he had to learn whether the information was protected by the attorney-client privilege. His questioning, therefore, was wholly appropriate and was certainly not error. Moreover, in light of the facts before the court, a *sua sponte* inquiry would have been in order and entirely appropriate in any case. A trial court has a perfect right to make *sua sponte* inquiries relative to perceived violations of its orders.

The majority next complains that the trial judge's inquiry was overly broad when he asked, "[A]re you in possession of statements by Mr. Decker of his intention to commit a crime?" The majority mistakenly interprets

this as the sort of fishing expedition the Supreme Court warned against when it articulated this standard in *United States v. Zolin* (1989), 491 U.S. 554, 570-71, 105 L. Ed. 2d 469, 489-90, 109 S. Ct. 2619, 2630-31.

The majority's concern is ill-founded. I would agree with the majority that, standing alone, this question is broad. However, the majority blithely ignores the context in which the request was made. In context, it is clear that the judge was asking no more than whether Mr. Decker had talked to Fischer about kidnapping his child. This is not a fishing expedition. There is but one crime that the judge could have possibly anticipated, or that would have even been relevant.

Further, as already noted, the trial judge offered to have the *in camera* inspection conducted by another judge. This is not only consistent with today's opinion, it also shows both forbearance and respect for the attorney-client privilege. Fischer, however, refused to cooperate with any inquiry, regardless of who conducted it or how tailored it might have been. Her refusal could not and cannot be justified, and the court was right to hold her in contempt.

Finally, the majority rules that the trial court's order was in error on the hypertechnical and legalistic grounds that it ordered contemnor to disclose information pursuant to Rule 4—101(d)(3) (107 Ill. 2d R. 4—101(d)(3)) instead of Rule 4—101(d)(2) (107 Ill. 2d R. 4—101(d)(2)) (153 Ill. 2d at 328). The court had, earlier in the proceedings, determined that Rule 4—101(d)(2) did not apply.

This ruling epitomizes the cliche "form over substance." Rule 4—101(d)(2) allows an attorney to disclose information pursuant to a court order without repercussion. Rule 4—101(d)(3) gives an attorney the discretion to disclose, also without punishment, a client's intent to commit a crime, even when not required to do so by Rule 4—101(c). However, a court may order an attorney

to disclose a client's intent to commit such a crime. No one disputes this power.

We are faced here with a court order to disclose the intent to commit the type of crime anticipated by Supreme Court rules and pursuant thereto. The majority voids the order, not because the judge was without the power to issue it nor because the attorney retained the discretion to disobey it; but rather because, although the subsection of the rule was cited by the judge, the subsection of the subsection was not cited. This type of hyper-technicality and legalism is deserving of scorn rather than official approbation.

The majority opinion lays down the correct threshold that must be met before an *in camera* inspection may be held to determine the existence of the attorney-client privilege. I have no quarrel with that threshold. However, that threshold was met *de facto* in this case, and the trial judge's order should not be vacated. Without the benefit of the precise procedural steps articulated in today's opinion, the trial judge gave Fischer process closely approximate to what the majority opinion now requires. Any difference can only be classified as harmless. We do the public a disservice when we disarm the judiciary of its only weapon against those whose actions undermine its authority and impede the administration of justice. The majority overturns a proper contempt conviction, and from that decision I respectfully dissent.